HOLLY HOFFMAN, Plaintiff-Appellee and Cross-Appellant, v. ALBERTO F. ALTAMORE, Defendant-Appellant and Cross-Appellee.

Second District   No. 2—03—1093

Opinion filed September 7, 2004.

Alberto F. Altamore, of Rockford, appellant *pro se.*

Angela Connelly Bresnahan, of Holmstrom & Kennedy, P.C., of Rockford, for appellee.

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Alberto F. Altamore, appeals the judgment of the circuit court awarding plaintiff, Holly Hoffman, the sum of $531.67 representing her renters' security deposit that defendant had retained on the ground that plaintiff did not vacate the premises at the end of her lease term. Plaintiff cross-appeals, arguing that the trial court erred in denying her request under section 1 of the Security Deposit Return Act (765 ILCS 710/1 (West 2002)) for an award equal to twice the amount of her security deposit plus costs and attorney fees. We affirm.

Plaintiff filed a complaint seeking return of the $550 security deposit that she claimed defendant wrongfully withheld after her lease term ended. Plaintiff also claimed that she was entitled to penalties allowed by section 1 of the Security Deposit Return Act.

The case proceeded to a bench trial. Plaintiff testified that she had entered into a lease agreement with defendant for the rental of 6042 Boxwood Drive Apt. #3 in Rockford. The lease was for a term of one year, from September 1, 2001, through August 31, 2002. Plaintiff introduced a copy of the lease into evidence.

Plaintiff testified that she asked defendant in the middle of August 2002 if she could rent month-to-month after the expiration of the current term. Plaintiff explained to defendant that she could not afford another one-year lease. When defendant declined plaintiff's request, she told him that she was not certain whether she would be renewing her lease for another year. Plaintiff did not contact defendant again regarding whether she would renew the lease.

Plaintiff testified that, on August 31, 2002, she removed all of her belongings from the apartment. The next day, September 1, 2002, she cleaned the apartment. That afternoon, she placed her apartment key in the mailbox of defendant's residence. She included with the key a typewritten note, a copy of which was introduced into evidence. The note reads:

"Dear Al and Linda:

Apartment #3, at 6042 Boxwood Drive is empty, and available to you. I do apologize if we had a miscommunication about when I would be leaving. The apartment is, however, empty and clean, by the first. When you have evaluated its condition, I would appreciate a call *** to let me know when I might expect my security deposit. Thank you, and I again I apologize for any confusion."

Plaintiff testified that, about two weeks after she vacated the apartment, she contacted defendant's office about her security deposit because she had not heard anything from defendant. She left a message with defendant's secretary. A week later, having heard no response from defendant, plaintiff called and left another message about the security deposit. Defendant then returned her call. Defendant told plaintiff that he did not realize that she had moved out of the apartment. In regard to the security deposit, defendant explained that he wanted to wait until he found a new tenant before they discussed the issue further. After this conversation, plaintiff waited for defendant to contact her. After leaving several more messages for defendant and receiving no reply, plaintiff drove past the apartment. Plaintiff testified that it appeared to her that someone was now occupying the apartment.

Plaintiff testified that she did manage to speak with defendant on one more occasion. During that conversation, defendant raised the issue of the apartment's garbage disposal. Plaintiff explained to defendant that the garbage disposal was not working when she moved in and that it rarely worked during her tenancy. An argument ensued. Although defendant never expressly stated that he would not return her security deposit, plaintiff believed that in the wake of the argument, he would not return it.

On cross-examination, plaintiff admitted that she did not provide defendant any advance notice that she intended to vacate the premises at the end of the lease term or that she intended to renew the lease. Plaintiff explained that she forgot to give notice because she "had a lot on [her] mind" at the time. Asked why she placed the apartment key and the note in defendant's mailbox rather than in the mail slot in defendant's door, plaintiff again noted that she was very busy that day and did not "put a lot of thought into it." She explained that she

did not ring defendant's doorbell and deliver the key to defendant personally because the day she came by was the Sunday of Labor Day weekend and she assumed that defendant was either out of town or did not want to be disturbed.

After plaintiff rested her case, Linda Altamore, defendant's wife, testified. Linda testified that she and defendant own five buildings on Boxwood Drive, each of which contains four rental units. Each building is on a separate parcel of property with its own legal description. Linda testified that the buildings do not comprise an apartment "complex" but are simply located on the same street. Linda noted that, although the buildings are identical to each other, they are also identical to other buildings on the same street.

Linda testified that she is also the manager of the buildings on Boxwood Drive. She testified that she instructs tenants to place their rent payments in the mail slot in the door of the Altamore residence rather than in the mailbox. Linda testified that she received an apartment key in the mailbox of the Altamore residence on September 1, 2002, but, contrary to plaintiff's claim, there was no note with the key identifying the apartment to which the key belonged. Linda testified that she did not learn that plaintiff had moved out until two weeks later when another tenant informed her. Linda testified that she retained plaintiff's security deposit of $550, equal to one month's rent, as rent for the month of September 2002 because plaintiff had not vacated the premises by September 1, 2002. Linda denied that any of the security deposit was retained to pay for damage to the apartment.

Defendant, who was *pro se*, also testified. Defendant generally corroborated the substance of plaintiff's testimony about their conversation regarding the possibility of renting month-to-month. Defendant agreed with plaintiff's testimony that the conversation left open the possibility that plaintiff would renew her lease.

The trial court entered judgment in favor of plaintiff for $531.67. In its written decision, the court held that (1) section 1 of the Security Deposit Return Act did not apply because plaintiff's security deposit was not withheld for property damage; (2) the lease did not require any written notice from plaintiff that she would not be renewing the lease, but required her only to yield up the premises at the end of the lease; and (3) plaintiff's relinquishment of the keys on September 1, 2002, did not create a new one-year lease. The trial court did not indicate why it entered judgment for $531.67 instead of $550, the full amount of the security deposit.[1] Defendant appeals, arguing that the

---

[1]The trial court apparently subtracted an amount equal to one day of rent. Plaintiff does not raise the issue of the deduction in her cross-appeal.

trial court erred in finding that plaintiff did not owe a full month's rent for failing to vacate the premises before September 1, 2002. Plaintiff cross-appeals, arguing that the trial court erred in not awarding her the penalties provided under section 1 of the Security Deposit Return Act.

## I. Defendant's Appeal

Defendant argues that, by failing to vacate the premises before September 1, 2002, plaintiff became a tenant at sufferance. Defendant further asserts that he terminated the tenancy a month later, and therefore plaintiff owes him rent for one month.

■ The applicable legal principles are as follows:

"Under Illinois law, the termination of a lease and the surrender of the premises are different events, and a tenant who remains in possession of the premises after his lease expires or is terminated becomes a tenant at sufferance. [Citation.] At the sole option of the landlord, a tenant at sufferance may be evicted as a trespasser or treated as a holdover tenant [citation], and when the landlord chooses the latter, a holdover tenancy, which is governed by the same terms of the original lease, is created. [Citation.]" *Meyer v. Cohen*, 260 Ill. App. 3d 351, 361-62 (1993).

The court's determination of whether a tenant has retained possession of the premises beyond the end of the lease is reviewed under the manifest weight standard. *Hoopes v. Prudential Insurance Co. of America*, 48 Ill. App. 3d 146, 149-50 (1977).

■ Plaintiff has directed our attention to two cases, *Hoopes* and *Commonwealth Building Corp. v. Hirschfield*, 307 Ill. App. 533 (1940), that both address the general issue of when a tenant may be said to have retained possession of the premises beyond a lease term so as to incur liability for additional rent. Although *Hirschfield* and *Hoopes* were decided more than four decades apart and use different terminology, their approaches are consistent. Both decisions are concerned with whether, after the expiration of the lease term, the tenant exercised dominion over the premises indicative of an intent to continue the tenancy. Comparison of both decisions with the present case yields the conclusion that plaintiff did not exercise such dominion over the premises after her lease expired.

In *Hirschfield*, the appellate court, consistent with the general principles stated above, explained that "a tenant who holds over after the expiration of his term may, at the election of the landlord, be held to be either a trespasser or tenant for another similar term." *Hirschfield*, 307 Ill. App. at 536. To constitute a "holding over" so as to trigger the landlord's option, the tenant's continued possession of the premises "must be voluntary," that is, the action of the tenant must "disclose the

right of the landlord to assume an intention on the tenant's part to create a second tenancy." *Hirschfield*, 307 Ill. App. at 536, 537.

In *Hirschfield*, the tenant notified the landlord two months before the expiration of the lease that the tenant did not intend to renew the lease. The tenant began packing and moving on September 27, three days before the expiration of the lease on September 30. Some employees of the landlord assisted the tenant during the move. As of midnight on September 30, the tenant had yet to move certain bedroom furniture, and he attributed the delay to his inability to use the elevators. The next day, October 1, the tenant finished moving and vacated the premises. Subsequently, the landlord demanded payment of two months' rent pursuant to a clause in the rental agreement whereby the tenant would be liable for double rent in the event of a holdover. When the tenant refused to pay, the landlord sued to recover the additional rent. The appellate court held that there was no holdover because the landlord did not have reason to believe that the tenant intended to extend her lease:

> "The uncontradicted evidence *** shows no grounds on which a voluntary agreement for a new tenancy could be inferred. [The tenant] was vacating the premises with reasonable speed and in good faith. The representatives of the landlord were present, knew and assisted them in getting their goods out of the apartment and were given extra pay for doing so. There is not a scintilla of evidence from which the jury could reasonably find there was any intention on the part of [the tenant] to continue the lease. Unfortunately, notwithstanding good faith, the removal of the last piece of furniture was delayed for a few hours. The tenant and his family did not arise at midnight and move out. They waited until the rising of the sun. Shortly thereafter the landlord availed himself of this supposed ancient rule of law and served notice of his intention to collect from [the tenant] $3,300 for his delict. There is nothing either in word or deed of the tenant that indicates an intention on his part to renew. Every action indicated the contrary intention. [The tenant], therefore, cannot be held on the theory of a voluntary contract." *Hirschfield*, 307 Ill. App. at 537-38.

The touchstone in *Hirschfield* was whether the landlord had reason to believe that the tenant intended to extend the lease. *Hirschfield* emphasized the good-faith efforts of the tenant toward vacating the premises, as witnessed by the agents of the landlord during the move. Of course, in the present case, neither defendant nor his agents witnessed plaintiff's efforts, nor did plaintiff even notify defendant that she intended to vacate the premises before the lease term expired.

However, the lease did not require that plaintiff provide any notice of her intent to vacate the premises. Plaintiff was required, at the end of the lease term, simply to "yield up the premises to the landlord without further notice." As it is undisputed that plaintiff never told defendant whether or not she intended to renew the lease, defendant should have presumed, per the lease, that plaintiff would vacate the premises at the end of the term and the apartment would be available on September 1, 2002, for another tenant. Thus, defendant had no basis for believing that plaintiff intended "to create a second tenancy" (*Hirschfield*, 307 Ill App. at 537).

In *Hoopes*, the lease agreement between the landlord and the tenant expired on September 30. The landlord sued, seeking rent for the month of October on the theory that the tenant did not relinquish possession of the premises at the end of the lease term. At trial, the tenant's witnesses testified that the tenant gave notice of an intent to vacate the premises by the end of the lease term and that the tenant in fact did vacate before the end of the term. To show that the tenant retained possession, the landlord introduced evidence that: (1) the lights were left on in the premises after the lease expired, and the electricity was billed to the tenant until November 20; (2) the tenant left its business decals on the doors and exterior of the building and also left signs in the windows indicating it had moved; and (3) one of the tenant's employees retained a key and gained access to the premises after the expiration of the lease to remove a decal from the front door. *Hoopes*, 48 Ill. App. 3d at 147-48.

The appellate court affirmed the trial court's grant of a directed finding in the tenant's favor. *Hoopes*, 48 Ill. App. 3d at 151. As the case was tried in a bench trial, the appellate court determined whether the trial court's decision was against the manifest weight of the evidence rather than whether the evidence was so overwhelming that a contrary verdict could not stand. *Hoopes*, 150 Ill. App. 3d at 149-50. In affirming, the appellate court relied on the tenant's evidence that it gave notice of its intent to vacate the premises before the end of the lease term and that it did in fact vacate before the end of the term. The appellate court held that the evidence adduced by the landlord did not conclusively indicate that the tenant retained possession of the premises after the lease term:

> "We are aware of no authority for the proposition that by leaving the lights on at the end of the tenancy a tenant becomes a holdover tenant in possession. Under the terms of this lease, [the tenant] was not required to remove signs or fixtures, and leaving them behind does not constitute retained possession. Nor was [the tenant] required to contact [the landlord] at the end of the term in

order to walk through the premises to survey any damage or make an affirmative tender of possession. Such requirements are common in leases, but this lease contains no such requirement.

Finally, the retention of one key which [the tenant's] secretary used to gain access to the premises to remove a decal from the door may be evidence of possession, but is not conclusive. It was explained that this one key was not mailed to [the landlord] because the secretary who used it was on vacation. Her using it several weeks later to remove the decal may be construed as a trespass rather than a showing of retained possession." *Hoopes*, 48 Ill. App. 3d at 151.

Here, as in *Hoopes*, the key to the premises was not relinquished before the lease expired. This fact was not accorded decisive weight in *Hoopes*, and we will not give it decisive weight here. At most, plaintiff committed a trespass in returning to the apartment the day after the lease expired. We recognize that *Hoopes* cited the tenant's notice of its intent to vacate the premises as support for the trial court's finding that the tenant did vacate the premises before the end of the lease term. Such notice was lacking in the present case. *Hoopes*, however, gave equal weight to the tenant's witnesses' testimony that the tenant had moved out before the end of the lease term. See *Hoopes*, 48 Ill. App. 3d at 151. In the present case, plaintiff testified that she moved out all of her belongings before September 1, 2002. Defendant, of course, disputes that plaintiff moved out before that date. "When the testimony of witnesses is conflicting, it is within the exclusive province of the trial court, as the trier of fact, to determine the witnesses' credibility and the weight to be given their testimony." *M.J. Oldenstedt Plumbing Co. v. K mart Corp.*, 257 Ill. App. 3d 759, 766-67 (1994). We cannot say that the trial court erred in believing plaintiff over defendant. Moreover, we do not believe that the lack of notice was decisive in this case. The tenant's provision of notice in *Hoopes* was inferential support for the ultimate finding that the tenant had vacated the premises before the end of the lease term. There is no indication that the provision of notice was the *sine qua non* of the decision. Here, there was adequate evidence, regardless of the absence of notice, to support the trial court's finding that plaintiff did not retain possession of the apartment after the lease expired.

Defendant argues that plaintiff's testimony suffers from several "discrepancies" that cast a cloud on her claim that she moved all of her belongings out of the apartment on August 31. First, defendant questions why plaintiff would place the apartment key in defendant's mailbox rather than drop it in the mail slot or attempt to give it to defendant personally, especially since September 1, 2002, was a Sunday

and the following day was a holiday, and hence it was likely that defendant would not check his mailbox for two days. Defendant also questions why plaintiff would wait two weeks after dropping off the key to inquire about the security deposit. Finally, defendant asks, "[H]ow did the plaintiff reasonably expect to get her damage deposit back if the September 1, 2002 note did not have a forwarding address?"

Plaintiff, we note, testified that she did not attempt to deliver the key to defendant personally because she was in a hurry. As for why plaintiff waited for two weeks before phoning defendant about the security deposit, plaintiff testified that she first waited for defendant to respond to the note she included with the key. And, finally, the note, though lacking a forwarding address, included a phone number where plaintiff could be reached. Defendant, of course, denies that he received any such note. It was the trial court's province as finder of fact to weigh the testimony of the witnesses and determine their credibility (*M.J. Oldenstedt*, 257 Ill. App. 3d at 766-67), and we will not upset the trial court's determination.

Defendant also argues that a "landlord does not bear, nor should the landlord bear, the risk of whether a tenant is going to move out on a timely basis." To hold otherwise, defendant reasons, would "create a herculean task for landlords requiring them to monitor each of their tenants to determine when they moved their belongings out." Defendant could have avoided this "herculean task" by drafting the lease agreement differently. As it stands, the agreement provides that plaintiff was required, at the expiration of the lease term, to "yield up the premises to the landlord without further notice." By forgoing notice, defendant loaded himself with the task of learning precisely when plaintiff vacated the premises.

## II. Plaintiff's Cross-Appeal

■ Plaintiff argues that section 1 of the Security Deposit Return Act entitles her to damages in an amount equal to twice her security deposit, together with costs and reasonable attorney fees. Section 1 of the Security Deposit Return Act provides:

> "*A lessor of residential real property, containing 5 or more units,* who has received a security deposit from a lessee to secure the payment of rent or to compensate for damage to the leased property may not withhold any part of that deposit as compensation for property damage unless he has, within 30 days of the date that the lessee vacated the premises, furnished to the lessee, delivered in person or by mail directed to his last known address, an itemized statement of the damage allegedly caused to the premises and the estimated or actual cost for repairing or replacing each item on

that statement, attaching the paid receipts, or copies thereof, for the repair or replacement. If the lessor utilizes his or her own labor to repair any damage caused by the lessee, the lessor may include the reasonable cost of his or her labor to repair such damage. If estimated cost is given, the lessor shall furnish the lessee with paid receipts, or copies thereof, within 30 days from the date the statement showing estimated cost was furnished to the lessee, as required by this Section. If no such statement and receipts, or copies thereof, are furnished to the lessee as required by this Section, the lessor shall return the security deposit in full within 45 days of the date that the lessee vacated the premises.

Upon a finding by a circuit court that a lessor has refused to supply the itemized statement required by this Section, or has supplied such statement in bad faith, and has failed or refused to return the amount of the security deposit due within the time limits provided, the lessor shall be liable for an amount equal to twice the amount of the security deposit due, together with court costs and reasonable attorney's fees." (Emphasis added.) 765 ILCS 710/1 (West 2002).

The parties disagree over whether defendant is a "lessor of residential real property containing 5 or more units." Defendant argues that, because the building that housed plaintiff's apartment contained only four units, he is not subject to the statute. Plaintiff suggests that the four units may be aggregated with the units in defendant's four other buildings on the same street to equal 20 units.

The trial court did not resolve this issue but instead held that section 1 of the Security Deposit Return Act was inapplicable because defendant retained plaintiff's security deposit as payment for September rent, not as reimbursement for damage to the apartment. See *Applegate v. Inland Real Estate Corp.*, 109 Ill. App. 3d 986, 991 (1982) (section 1 of the Security Deposit Return Act "does not appear to be intended by the legislature to apply other than where a part or all of the security deposit is retained to compensate for claimed property damage"). The issue is complicated by the fact that the lease prohibits the security deposit from being applied to rent. However, we need not review the trial court's determination of this issue. We may affirm the trial court's judgment on any basis appearing in the record. *Inland Land Appreciation Fund, L.P. v. County of Kane*, 344 Ill. App. 3d 720, 726 (2003). We find that section 1 of the Security Deposit Return Act does not apply because defendant does not lease the minimum number of units required by the provision. In interpreting the statute, our overarching purpose is to give effect to the legislature's intent, of which the best indicator is the language of the statute. *County of Cook v. Illinois Labor Relations Board Local Panel*, 347 Ill. App. 3d 538, 546-47 (2004).

In analyzing this issue, we turn first to section 1 of the Security Deposit Interest Act (765 ILCS 715/1 (West 2002)), which contains language similar to yet crucially different from that of section 1 of the Security Deposit Return Act. Section 1 of the Security Deposit Interest Act provides:

> "A lessor of residential real property, containing 25 or more units *in either a single building or a complex of buildings located on contiguous parcels of real property*, who receives a security deposit from a lessee to secure the payment of rent or compensation for damage to property shall pay interest to the lessee computed from the date of the deposit at a rate equal to the interest paid by the largest commercial bank, as measured by total assets, having its main banking premises in this State on minimum deposit passbook savings accounts as of December 31 of the calendar year immediately preceding the inception of the rental agreement on any deposit held by the lessor for more than 6 months." (Emphasis added.) 765 ILCS 715/1 (West 2002).

Section 1 of the Security Deposit Return Act and section 1 of the Security Deposit Interest Act both predicate their application on whether the lessor's "residential real property" contains a certain number of units, but only section 1 of the Security Deposit Interest Act expressly provides that units within "a single building or a complex of buildings located on contiguous parcels of real property" may be aggregated. Generally, when the legislature uses certain words in one instance and different words in another, different results are intended. *Emerald Casino, Inc. v. Illinois Gaming Board*, 346 Ill. App. 3d 18, 35 (2003). A statute should be construed so that no term is rendered superfluous or meaningless. *Follett Corp v. Department of Revenue*, 344 Ill. App. 3d 388, 395 (2003). In light of these canons, it is obvious that the elaborated definition of "residential real property" in section 1 of the Security Deposit Interest Act was meant to be broader than the definition of the same term in section 1 of the Security Deposit Return Act. Section 1 of the Security Deposit Interest Act clarifies that "residential real property" includes not just buildings on the same parcel of real property but also buildings on contiguous parcels. Therefore, "residential real property" for purposes of section 1 of the Security Deposit Return Act is limited to buildings on the same parcel of real property.

This was the interpretation adopted in *Tobin v. McClure*, 144 Ill. App. 3d 33 (1986), although *Tobin* was decided before Public Act 87—386 (Pub. Act 87—386, eff. January 1, 1992) added the language, "in either a single building or a complex of buildings located on contiguous parcels of real property," to section 1 of the Security Deposit

Interest Act. Interpreting section 1 of the Security Deposit Return Act, the appellate court in *Tobin* held:

> "The intent of the legislature is clear. A 'unit' of residential real property, while not defined by the statute, clearly refers to an identifiable living space within a larger structure containing one or more such spaces. Where a parcel of residential real property is in the form of an apartment complex or contains other multiple, related structures, the number of units may be aggregated. [Citation.]" *Tobin*, 144 Ill. App. 3d at 37.

In *Tobin*, the building that contained the tenant's apartment was located on its own parcel of property, and the appellate court held that the units in that building could not be aggregated with units in buildings on other parcels. Here, too, the building that housed plaintiff's apartment was on a separate parcel of land with its own legal description. Section 1 of the Security Deposit Return Act does not allow aggregation in this circumstance. Therefore, because the building contained only four units, defendant is not a "lessor of residential real property containing five or more units." The requirements of the statute have not been met.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

*Affirmed.*

CALLUM and GROMETER, JJ., concur.